**Jaythan KENDRICK (96–A–1245), Petitioner,**

v.

**Charles GREINER, Superintendent of Green Haven Correctional Facility, Respondent.**

**Nos. 00–CV–4259 (JBW), 03–MISC–0066 (JBW).**

United States District Court, E.D. New York.

Nov. 25, 2003.

**350**

Jaythan Kendrick, Stormville, NY, Pro se.

James A. Dolan, District Attorney, Queens County, Kathleen P. O'Leary, Kew Gardens, NY, for Respondent.

## MEMORANDUM, JUDGMENT & ORDER

WEINSTEIN, Senior District Judge.

Petitioner was convicted primarily of second-degree murder for the stabbing death of an elderly woman on a sidewalk in Queens. His conviction was achieved largely on the basis of the identification testimony of a single eyewitness, a ten-year-old boy who observed much of the assault from an apartment window three floors above the street. The boy was initially unable to identify petitioner from a lineup as the assailant, instead identifying a "filler" as the killer. He changed his mind and identified petitioner only after asking a detective whether his choice had been "right" and being told that it was not. The boy was allowed by the state court judge to identify petitioner at trial, nearly assuring a conviction.

A reasonable jurist could conclude that the pretrial lineup was unduly suggestive and that the witness's pretrial and in-court identifications of petitioner were unreliable. A strong argument could be made that Supreme Court precedent, as embodied in *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) and *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), is best construed as requiring suppression of the witness's identifications in the instant case. Were this court sitting in direct appellate review of petitioner's conviction, vacatur of the judgment and a new trial would be seriously considered. A federal habeas court, however, owes great deference to the rulings of the state courts as a matter of comity and statutory command. The writ may be granted only if the ruling of the Appellate Division of the New York

Supreme Court was "contrary to" or an "unreasonable application" of clearly established federal law as determined by the Supreme Court.

Because the state court's resolution of petitioner's claims was neither contrary to nor an unreasonable application of Supreme Court law, and because petitioner cannot show by clear and convincing evidence that the court's factual determinations were unreasonable, the writ is denied. No hearing in this matter is necessary. This memorandum briefly addresses petitioner's claims.

## I. Facts and Procedural History

Petitioner was tried for the homicide of a 72–year–old woman. The victim was stabbed to death in the street with a scissors blade after she refused to surrender her purse to a robber.

Proof of petitioner's guilt was not particularly strong. The prosecution's primary evidence was the identification testimony of a ten-year-old boy who, after hearing a scream, witnessed much of the struggle from inside his third-floor apartment. The boy, Brandon Rogers, described the assailant to police as a male African–American, wearing a white or whitish-yellow jacket, white shoes without socks, dark blue sweatpants and an army-type camouflage hat. Petitioner caught the attention of police officers after they saw him—an African–American man wearing a white jacket, dark pants, shoes with no socks, and an ordinary baseball cap—during their canvass of the neighborhood. Police asked petitioner if he had heard about the homicide and he replied that he had. When officers noticed a red stain on his jacket they asked him to accompany them to the precinct house. (Testing later showed the stain to be what petitioner claimed it was—lipstick.) He voluntarily went and answered questions about how he had spent his day.

As part of the investigation, petitioner was placed in a lineup with five fillers. The ten-year-old boy who had witnessed the crime viewed the lineup after being told that the killer was in it (a serious error in suggestion to begin with). Trial Tr. at 470 ("I asked him was one of them the murderers and he said yes one of them will be the real one."). He initially chose a filler—not petitioner—as the assailant, though he indicated during the trial that before choosing he had decided the assailant was either "three or six" (i.e., either petitioner or a filler). *Id.* at 476. At a pretrial *Wade* hearing, Rogers answered questions from the prosecutor concerning what happened next:

Q  After you came out of the line-up room, okay, did you talk to the detectives about why you picked number six [a filler]?

A Yes.

Q  And what did you tell them?

A I said the reason I picked number six is because number three [petitioner] looked too short and number six looked the size, looked like the size from my distance from the third floor and he looked nervous, and he had white shoes, just like him.

THE COURT: And what is this?

THE WITNESS: And he had white shoes just like him.

Q  Now when did you tell the detectives that you felt that it was number three?

A When I said, "Did I get the right person," and they said, "No." So I said, "It was number three, wasn't it?" So they asked me, "Why do you say number three?" And I said, "Reason I said number three is because that was my

second choice of picking the people from the line-up."

*Wade* Hr'g Tr. at 111.

On cross-examination, the boy similarly testified concerning his initial misidentification and then his "correct" identification of petitioner as the assailant:

Q   Now you went out of the room and you had a conversation with the detective outside the room, is that correct?

A Yes.

Q   What was it that you said to him outside the room, and what, if anything, did he say to you?

A I said, "It was number three, wasn't it?"

Q   What?

A When I had went out the room, I said, "It was number three, wasn't it?"

Q   You said, "Wasn't it number three." Then what did he say?

A He said, "What makes you think it was number three?" I said, "Because that was my second choice."

Q   What did he say then?

A He said, "I think you knew that it was number three," and I said, "No, I didn't. It was just my second choice."

*Id.* at 131–32.

During the trial, Rogers further indicated that after choosing the filler, he heard a detective tell his mother that he had picked the wrong person and that he changed his choice only after hearing that conversation. Trial Tr. at 484.

The detective's description of events at the lineup was similar to Rogers', though, according to the detective, the boy's correction was unprovoked:

Q   Did you have any conversation with Brandon [Rogers] after the line-up itself?

A Yes.

Q   What was the substance of that conversation?

A I saw Brandon immediately following the line-up and he asked me if he had picked the right man and I told him that it didn't matter who he picked as long as he picked the person who he thought it was. Then he just made the statement, he said it was number three.

Q   What did he say about number three?

A He said it was number three.

Q   What did you say to him?

A I said, "If you thought it was number three, why did you pick number six?" He goes, "It was between number three and number six, but because number six was wearing the same type shoes, I picked number six."

*Id.* at 35.

The hearing court denied a motion from defense counsel to suppress the boy's identification of petitioner:

[T]he conduct of Detective Deutsch with respect to his directions and comments to Brandon at the time of the lineup was ... proper in all respects. His demeanor did not change whether or not a positive or negative identification had been made, rather, his direction to Brandon was to pick the person who he thought did it. Brandon's subsequent identification of the defendant after he first selected another person, to wit, number six, was because number six wore the identical shoes that were worn during the crime. Indeed, were this court to find that the identification procedure herein was invalid—which it does not—this Court finds that Brandon's observation of the crime was of sufficient duration to provide an independent source for Brandon to make an in-court identification during trial. Indeed, at this hearing, Brandon was asked to see if he could identify anyone in the courtroom and he, in fact, identified [petitioner] as being the male black who was

struggling with the woman that night. Therefore, based upon the totality of the circumstances surrounding the lineup identifications, the defendant has failed to demonstrate any impropriety whatsoever on the part of law enforcement. July 6, 1995 Order at 10–11.

The boy identified petitioner at trial and testified to having chosen him from a line-up. (Petitioner was the only African-American male in the courtroom not sitting in the jury box.) The propriety of the hearing court's ruling on the motion to suppress the identification testimony is addressed *infra*. *See* Part VIII.B.2.

There was no physical evidence directly linking petitioner to the stabbing. Although officers seized clothing from petitioner's home, no traces of the victim's blood were found. No forensic evidence at the crime scene linked petitioner to the killing. No fingerprint evidence was introduced.

There was, however, other evidence introduced at trial that a reasonable juror could find tended to prove petitioner's guilt. Rogers testified that the whitish jacket petitioner was wearing when arrested "appeared" to be the same as that worn by the assailant. He also testified that a black pocketbook recovered from petitioner's home "looked like" the pocketbook the victim was struggling to keep before being stabbed.

Several pocketbooks, including the black one, were recovered from petitioner's home and introduced into evidence. Petitioner claimed they belonged to his wife, with whom he was separated. His wife testified, however, that the black pocketbook did not belong to her and that she had never seen it before. She did identify another of the pocketbooks as being hers.

A camouflage cap was recovered from petitioner's home and introduced into evidence. Petitioner claimed it belonged to an acquaintance who stayed at his apartment. No evidence that petitioner had ever worn the cap (such as a hair sample recovered from the cap) was introduced at trial.

A prosecution witness testified that he had been in petitioner's apartment one time—about a month and half before the incident—and that while there he had seen a single scissor blade like the one that was recovered from the crime scene.

Another prosecution witness—who was testifying for the prosecution in the hope of receiving sentencing consideration for his conviction for an unrelated crime—testified that he saw petitioner, whom he knew, running away from the scene of the stabbing with a pocketbook clutched under his arm like a football. He described petitioner as wearing a white jacket, camouflage hat, brown pants, and shoes without socks. On cross examination he described his prior convictions, including an armed robbery in which a boxcutter was used. He also explained that although he saw the victim lying in her pooling blood, he left the scene and went home without contacting the police.

Other evidence of petitioner's guilt included testimony from a detective about arguably inculpatory statements made to him by petitioner during the investigation. Petitioner told him that he knew about the killing because that day he had spoken to some uniformed officers who had told him about the incident. He also stated that he did not use narcotics, but a search of his apartment revealed crack pipes and other drug paraphernalia. Petitioner eventually conceded to detectives that he was addicted to crack cocaine and spent $70 to $80 on drugs a day.

The detective further testified that during a lull in the interrogation, petitioner spontaneously told him,

If you have been talking to people who know me, then you know I'm good

with a knife. Then he said if I was going to kill somebody, I wouldn't stab them with a scissor, I would use a knife. And I said to him what made you say that. And he said—I said first of all what made you even think that we were talking about a scissor in this case. And he told me you told me about the scissor. And I said no, I never told you about a scissor.

And after a while we talked a little further. I went outside and I asked all the other detectives if they had mentioned a scissor to Mr. Kendrick, and they all told me no that they had not mentioned.

Trial Tr. at 561. The last portion of this statement was stricken from the record as inadmissible hearsay.

The detective also testified that he said to petitioner,

[I]f we find anything out there that has your fingerprint on it, could you explain to me how anything of yours would be at the crime scene. So he said well there are things missing out of my apartment that I don't know where they are, and I don't know what happened to them.

So I said well why don't you give me a list of things that are missing from your apartment and if these things do turn up as having your fingerprints on them or being at the crime scene we can account for all those items. And he gave me a list of things that he said were missing from his apartment.

.    .    .    .    .

He told me the following items: He said a knife. Then he said all of his kitchen knives were missing. Then he said a wallet, a hat, a pair of scissors were all missing. That was the list.

*Id.* at 563.

Petitioner had never been convicted of any crime, but at the time of trial a misdemeanor narcotics possession charge was outstanding. Prior to the start of trial, the court in a *Sandoval* ruling precluded the prosecution from cross-examining petitioner about the outstanding charge. Petitioner testified to his activities on the day of the incident and stated that he was innocent of the crime for which he was being convicted. After he indicated on direct examination that he had never been convicted of any crime, the trial court ruled that petitioner had opened the door to admission of the pending charge as impeachment evidence. Petitioner "opened the door" by providing the following answers to questions from his defense counsel:

Q Sir, have you ever been convicted of any crime anywhere in the world?

A No, I have not, never been convicted of a crime. I got a clean record.

.    .    .    .    .

Q What did you say to [the police officers at the precinct house]?

A I told them I didn't do it. I was not the one. I wasn't there. I kept saying that I was not there.

Q What did they keep saying to you?

A They kept getting closer. Then they started pushing on me, slapping cups of coffee at me. Calling me nigger. I mean they just—it turned horrible.

Q Wait a minute. Hold that. Who called you nigger?

A The police did.

Q Which one?

A I believe it was Deutsch started first.

Q Detective Deutsch?

A Yes.

Q Go ahead, then what happened?

.    .    .    .    .

A They kept saying every M.F. nigger is guilty until he proves his innocence and I kept saying that I was innocent

that *I have never been locked up before. I never did no time.* I said I'm a law abiding citizen. I wouldn't hurt anybody. And then they took me from there and they took me to the 14th Precinct.

Trial Tr. at 722, 744–45 (emphasis supplied).

The trial court ruled that "by his statement as I indicated before his emphatic denial that he's never been convicted of any crime also his statement that he was not, never got into any trouble before, accordingly that sworn testimony of his, I think the district attorney should have the opportunity to explore his sworn testimony that he was never in trouble before or never been locked up before." *Id.* at 789.

Petitioner was convicted of murder in the second degree and robbery in the first degree. He was sentenced to 25 years to life in prison.

His conviction was affirmed by the Appellate Division on direct appeal. Leave to appeal to the New York Court of Appeals was denied.

He filed a federal application for a writ of habeas corpus but moved to have the proceedings stayed so that he could exhaust his state remedies. He filed a motion to vacate judgment that was denied by the state trial court, with leave to appeal denied by the Appellate Division. He also filed an application for a writ of error coram nobis that was denied by the Appellate Division. Petitioner then sought to reopen the instant proceedings, filing an amended habeas application.

In his application for a writ of habeas corpus, as originally filed, petitioner raised five claims: (1) deprivation of due process because the trial court allowed cross-examination of petitioner on an unrelated misdemeanor arrest; (2) unduly suggestive lineup; (3) trial court's failure to read back testimony in response to a jury request; (4) trial court's exhibition of petitioner's jacket under conditions unlike those on the day the offense was committed; and (5) improper introduction into evidence of two pocketbooks received from petitioner's residence. Petitioner subsequently filed an amended petition in which he dropped the last three of these claims and raised a number of new claims: (1) ineffective assistance of trial counsel for failing to request a mistrial or seek reopening of a *Wade* hearing after witness testimony at trial supported the possibility of tainted identification procedures; (2) ineffective assistance of trial counsel for failing to make an opening statement; (3) ineffective assistance of trial counsel for failing to request 911 tapes; (4) ineffective assistance of trial counsel for failing to object to the bolstering of police officers; (5) *Rosario* and *Brady* violations created by the failure of the prosecution to disclose results of forensic fingerprint reports and analysis, and by the prosecution's failure to release DD5 reports to petitioner which revealed that another man had been arrested for the same crime one day after petitioner was selected from a lineup; and (6) ineffective assistance of appellate counsel. The judge previously assigned to this matter directed respondent to respond to the merits of each of petitioner's claims in the amended petition without prejudice to his argument that the newly added claims are untimely.

## II. Timeliness

Congress has set a one-year period of limitations for the filing of an application for a writ of habeas corpus by a person in custody pursuant to a state court judgment. *See* 28 U.S.C. § 2244(d)(1). This limitations period ordinarily begins to run on "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." *Id.* § 2244(d)(1)(A). A conviction becomes final for habeas pur-

poses when the Supreme Court "affirms a conviction on the merits on direct review or denies a petition for a writ of certiorari, or when the [the ninety-day period] for filing a certiorari petition has expired." *Clay v. United States,* 537 U.S. 522, 123 S.Ct. 1072, 1075, 155 L.Ed.2d 88 (2003) (discussing finality in context of federal conviction but noting also that "the Courts of Appeals have uniformly interpreted 'direct review' in § 2244(d)(1)(A) to encompass review of a state conviction by [the Supreme Court]"); *see also* Sup.Ct. R. 13.

Prisoners whose convictions became final before the effective date of Antiterrorism and Effective Death Penalty Act ("AEDPA"), April 24, 1996, had a grace period of one year, until April 24, 1997, to file their habeas application. *See Ross v. Artuz,* 150 F.3d 97, 103 (2d Cir.1998).

"[T]he district court has the authority to raise a petitioner's apparent failure to comply with the AEDPA statute of limitation on its own motion." *Acosta v. Artuz,* 221 F.3d 117, 121 (2d Cir.2000). "If the court chooses to raise sua sponte the affirmative defense of failure to comply with the AEDPA statute of limitation, however, the court must provide the petitioner with notice and an opportunity to be heard before dismissing on such ground." *Id.*

In calculating the one-year limitation period, the "time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted." 28 U.S.C. § 2244(d)(2).

The "filing of creative, unrecognized motions for leave to appeal" does not toll the statute of limitations. *Adeline v. Stinson,* 206 F.3d 249, 253 (2d Cir.2000); *see also Artuz v. Bennett,* 531 U.S. 4, 8, 121 S.Ct. 361, 148 L.Ed.2d 213 (2000) ("[A]n application is *'properly* filed' when its delivery and acceptance are in compliance with the applicable laws and rules governing filings.

These usually prescribe, for example, the form of the document, the time limits upon its delivery, the court and office in which it must be lodged, and the requisite filing fee.... The question whether an application has been 'properly filed' is quite separate from the question whether the claims contained in the application are meritorious and free of procedural bar." (emphasis in original; footnote omitted)).

■ In addition, the term "pending" in the statute has been construed broadly to encompass all the time during which a state prisoner attempts, through proper use of state procedures, to exhaust state court remedies with regard to a particular post-conviction application. *See Bennett v. Artuz,* 199 F.3d 116, 120 (2d Cir.1999), *aff'd,* 531 U.S. 4, 121 S.Ct. 361, 148 L.Ed.2d 213 (2000). "[A] state-court petition is 'pending' from the time it is first filed until finally disposed of and further appellate review is unavailable under the particular state's procedures." *Bennett,* 199 F.3d at 120; *Carey v. Saffold,* 536 U.S. 214, 122 S.Ct. 2134, 153 L.Ed.2d 260 (2002) (holding that the term "pending" includes the intervals between a lower court decision and a filing in a higher court for motions for collateral review). A motion for extension of time to file an appeal does not toll AEDPA's limitations period unless an extension is actually granted. *See Bethea v. Girdich,* 293 F.3d 577, 579 (2d Cir.2002).

The period of limitations set forth in AEDPA ordinarily does not violate the Suspension Clause. *See Muniz v. United States,* 236 F.3d 122, 128 (2d Cir.2001) ("[T]he Suspension Clause does not always require that a first federal petition be decided on the merits and not barred procedurally" (quotation omitted)); *Rodriguez v. Artuz,* 990 F.Supp. 275, 283 (S.D.N.Y.1998) (AEDPA statute of limitations is not, "at

least in general," an unconstitutional suspension of the writ).

█ The AEDPA statute of limitations is not jurisdictional and may be tolled equitably. *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir.2000). "Equitable tolling ... is only appropriate in 'rare and exceptional circumstances.' To merit application of equitable tolling, the petitioner must demonstrate that he acted with 'reasonable diligence' during the period he wishes to have tolled, but that despite his efforts, extraordinary circumstances 'beyond his control' prevented successful filing during that time." *Smaldone v. Senkowski*, 273 F.3d 133, 138 (2d Cir.2001). Although state prisoners are not entitled to counsel as of right in either New York state collateral or federal habeas corpus proceedings, the Court of Appeals for the Second Circuit has stated that "an attorney's conduct, if it is sufficiently egregious, may constitute the sort of 'extraordinary circumstances' that would justify the application of equitable tolling to the one-year limitations period of AEDPA." *Baldayaque v. United States*, 338 F.3d 145, 152 (2d Cir. 2003); *compare Smaldone*, 273 F.3d at 138–39 (attorney calculation error does not justify equitable tolling).

## III. AEDPA

Under AEDPA, a federal court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on the merits" in state court only if it concludes that the adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

An "adjudication on the merits" is a "substantive, rather than a procedural, resolution of a federal claim." *Sellan v. Kuhlman*, 261 F.3d 303, 313 (2d Cir.2001) (quoting *Aycox v. Lytle*, 196 F.3d 1174, 1178 (10th Cir.1999)). Under the "contrary to" clause, "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (O'Connor, J., concurring and writing for the majority in this part). Under the "unreasonable application" clause, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413, 120 S.Ct. 1495. Under this standard, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411, 120 S.Ct. 1495. In order to grant the writ there must be "some increment of incorrectness beyond error," although "the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir.2000) (internal quotation marks omitted).

"[F]ederal law, as determined by the Supreme Court, may as much be a generalized standard that must be followed, as a bright-line rule designed to effectuate such a standard in a particular context." *Overton v. Newton*, 295 F.3d 270, 278 (2d Cir. 2002); *see also Yung v. Walker*, 341 F.3d

104 (2d Cir.2003) (amended opinion) (district court's habeas decision that relied on precedent from the Court of Appeals is remanded for reconsideration in light of "the more general teachings" of Supreme Court decisions). The Court of Appeals for the Second Circuit has also indicated that habeas relief may be granted if a state court's decision was contrary to or an unreasonable application of "a reasonable extension" of Supreme Court jurisprudence. *Torres v. Berbary*, 340 F.3d 63, 72 (2d Cir.2003). Determination of factual issues made by a state court "shall be presumed to be correct," and the applicant "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

## IV. Exhaustion

In the past, a state prisoner's federal habeas petition had to be dismissed if the prisoner did not exhaust available state remedies as to any of his federal claims. *See Rose v. Lundy*, 455 U.S. 509, 522, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). "This exhaustion requirement is … grounded in principles of comity; in a federal system, the States should have the first opportunity to address and correct alleged violations of [a] state prisoner's federal rights." *Coleman v. Thompson*, 501 U.S. 722, 731, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). The exhaustion requirement requires the petitioner to have presented to the state court "both the factual and legal premises of the claim he asserts in federal court." *Daye v. Attorney General*, 696 F.2d 186, 191 (2d Cir.1982) (en banc).

Pursuant to AEDPA, a district court may now, in its discretion, *deny* on the merits habeas petitions containing unexhausted claims—so-called "mixed petitions." *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the state."). In addition, the state may waive the exhaustion requirement, but a "State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement." *Id.* § 2254(b)(3); *see also Ramos v. Keane*, No. 98 CIV. 1604, 2000 WL 12142, at *4 (S.D.N.Y.2000) (state's failure to raise exhaustion requirement does not waive the issue).

## V. Procedural Bar

A federal habeas court may not review a state prisoner's federal claims if those claims were defaulted in state court pursuant to an independent and adequate state procedural rule, "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750, 111 S.Ct. 2546. In determining whether a procedural bar is sufficient to preclude habeas review, a federal court must consider as "guideposts" the following:

> (1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had "substantially complied" with the rule given "the realities of trial," and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest.

*Cotto v. Herbert*, 331 F.3d 217, 240 (2d Cir.2003) (quoting *Lee v. Kemna*, 534 U.S. 362, 122 S.Ct. 877, 151 L.Ed.2d 820 (2002)).

■ .If a state court holding contains a plain statement that a claim is. procedurally barred then the federal habeas court may not review it, even if the state court also rejected the claim on the merits in the alternative. *See Harris v. Reed,* 489 U.S. 255, 264 n. 10, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) ("a state court need not fear reaching the merits of a federal claim in an *alternative* holding" so long as it explicitly invokes a state procedural rule as a separate basis for its decision).

When a state court says that a claim is "not preserved for appellate review" and then rules "in any event" on the merits, such a claim is not preserved. *See Glenn v. Bartlett,* 98 F.3d 721, 724–25 (2d Cir. 1996). When a state court "uses language such as 'the defendant's remaining contentions are either unpreserved for appellate review or without merit,' the validity of the claim is preserved and is subject to federal review." *Fama v. Comm'r of Corr. Services,* 235 F.3d 804, 810 (2d Cir.2000). Where "a state court's ruling does not make clear whether a claim was rejected for procedural or substantive reasons and where the record does not otherwise preclude the possibility that the claim was denied on procedural grounds, AEDPA deference is not given, because we cannot say that the state court's decision was on the merits." *Su v. Filion,* 335 F.3d 119, 126 n. 3 (2d Cir.2003) (citing *Miranda v. Bennett,* 322 F.3d 171, 178 (2d Cir.2003)). This congeries of holdings leaves it an open question whether there are "situations in which, because of uncertainty as to what the state courts have held, no procedural bar exists and yet no AEDPA deference is required." *Id.*

VI. Ineffective Assistance of Counsel

The Counsel Clause of the Sixth Amendment provides that a criminal defendant "shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. This right to

counsel is "the right to *effective* assistance of counsel." *McMann v. Richardson,* 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970) (emphasis added). The Supreme Court has explained that in giving meaning to this requirement we must be guided by its purpose—"to ensure a fair trial"—and that therefore the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to prevail on a Sixth Amendment claim, a petitioner must prove both that counsel's representation "fell below an objective standard of reasonableness" measured under "prevailing professional norms," *id.* at 688, 104 S.Ct. 2052, and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694, 104 S.Ct. 2052. *See also Wiggins v. Smith,* 539 U.S. ——, ——, 123 S.Ct. 2527, 2529, 156 L.Ed.2d 471 (2003); *United States v. Eyman,* 313 F.3d 741, 743 (2d Cir.2002). A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

The performance and prejudice prongs of *Strickland* may be addressed in either order, and "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice ... that course should be followed." *Id.* at 697, 104 S.Ct. 2052. In evaluating the prejudice suffered by a petitioner as a result of counsel's deficient performance, the court looks to the "cumulative weight of error" in order to determine whether the prejudice "reache[s] the constitutional threshold." *Lindstadt v. Keane,* 239 F.3d 191, 202 (2d Cir.2001). The court must also keep in mind that "a verdict or conclusion only

weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland,* 466 U.S. at 696, 104 S.Ct. 2052. "The result of a [criminal] proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Purdy v. Zeldes,* 337 F.3d 253, 260 (2d Cir. 2003) (quoting *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052). Ineffective assistance may be demonstrated where counsel performs competently in some respects but not in others. *See Eze v. Senkowski,* 321 F.3d 110, 112 (2d Cir. 2003).

As a general matter, strategic choices made by counsel after a thorough investigation of the facts and law are "virtually unchallengeable," though strategic choices "made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland,* 466 U.S. at 690–91, 104 S.Ct. 2052. Counsel, in other words, "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691, 104 S.Ct. 2052. Where counsel fails to make a reasonable investigation that is reasonably necessary to the defense, a court must conclude that the decision not to call an expert cannot have been based on strategic considerations and will thus be subject to review under *Strickland's* prejudice prong. *See Pavel v. Hollins,* 261 F.3d 210, 223 (2d Cir.2001) (counsel ineffective in a child sexual abuse case where his failure to call a medical expert was based on an insufficient investigation); *Lindstadt,* 239 F.3d at 201 (same). The Court of Appeals for the Second Circuit has recently gone so far as to imply that all of counsel's significant trial decisions must be justified by a sound strategy—a significant raising of the bar

that would appear to require an unrealistic degree of perfection in counsel. *See Eze,* 321 F.3d at 136 (remanding to district court for factual hearing because it was "unable to assess with confidence whether strategic considerations accounted for ... counsel's decisions").

There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052.

Each factual claim made in support of an allegation of ineffective assistance of counsel must be fairly presented to a state court before a federal habeas court may rule upon it. *See Rodriguez v. Hoke,* 928 F.2d 534, 538 (2d Cir.1991) (dismissing petition as unexhausted where petitioner's claim of ineffective assistance of counsel alleged more deficiencies before the habeas court than were presented to the state court, because "[t]he state courts should have been given the opportunity to consider all the circumstances and the cumulative effect of all the claims as a whole" (quotation omitted)). Where an additional factual claim in support of the ineffective assistance allegation merely "supplements" the ineffectiveness claim and does not "fundamentally alter" it, dismissal is not required. *Caballero v. Keane,* 42 F.3d 738, 741 (2d Cir.1994). Each significant factual claim in support of an ineffective-assistance allegation premised on appellate counsel's deficient performance must be exhausted. *See Word v. Lord,* No. 00 CIV. 5510, 2002 WL 32145769, at *11 (S.D.N.Y. Mar. 18, 2002) (Magistrate's Report and Recommendation).

Although the *Strickland* test was formulated in the context of an ineffective assistance of trial counsel claim, the same test is used with respect to claims of ineffective appellate counsel. *See Claudio v. Scully,* 982 F.2d 798, 803 (2d Cir.1992). Appellate

counsel does not have a duty to advance every nonfrivolous argument that could be made, *see Jones v. Barnes,* 463 U.S. 745, 754, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983), but a petitioner may establish that appellate counsel was constitutionally ineffective "if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker," *Mayo v. Henderson,* 13 F.3d 528, 533 (2d Cir.1994). Either a federal or a state law claim that was improperly omitted from an appeal may form the basis for an ineffective assistance of appellate counsel claim, "so long as the failure to raise the state ... claim fell outside the wide range of professionally competent assistance." *Id.* (quotations omitted).

## VII. Certificate of Appealability

A certificate of appealability may be granted with respect to any one of petitioner's claims only if petitioner can make a substantial showing of the denial of a constitutional right. **Petitioner has a right to seek a certificate of appealability from the Court of Appeals for the Second Circuit.** *See* 28 U.S.C. § 2253; *Miller–El v. Cockrell,* 537 U.S. 322, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). The court has taken into account the rule of section 2253(c)(3) of Title 28 of the United States Code that a certificate of appealability "shall indicate which specific issue or issues satisfy the [substantial showing of the denial of a constitutional right] required by paragraph (2)." *See also Shabazz v. Artuz,* 336 F.3d 154, 160 (2d Cir. 2003).

This opinion complies with *Miranda v. Bennett,* 322 F.3d 171, 175—77 (2d Cir. 2003), and Rule 52 of the Federal Rules of Civil Procedure. No other issue open to consideration by this court has merit. *See Sumner v. Mata,* 449 U.S. 539, 548, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981) ("a court need not elaborate or give reasons for rejecting claims which it regards as frivolous or totally without merit").

## VIII. Analysis

### A. Timeliness of Claims

There is no dispute that petitioner's initial habeas application was filed within the limitations period set forth in AEDPA. Petitioner's first two claims, which were first presented in that application, are timely and may be addressed in this proceeding. All but one of the newly added claims appear, however, to be untimely and precluded from review.

Petitioner was convicted and sentenced on February 15, 1996. The Appellate Division affirmed on December 14, 1998. Leave to appeal was denied by the New York Court of Appeals on April 14, 1999. Because petitioner did not seek a writ of certiorari from the Supreme Court, his conviction became final 90 days later, on July 13, 1999. Absent statutory or equitable tolling, his habeas application was due one year later, on July 13, 2000.

■ On July 11, 2003, which was 2 days before the expiration of the AEDPA limitations period, petitioner filed his initial habeas application. The claims raised in that initial filing are, as noted above, timely. Petitioner amended his habeas application on July 15, 2002, which was 732 days after the limitations period had expired. Claims raised for the first time in the amended petition are therefore untimely unless, with other exceptions not relevant here, petitioner can demonstrate that statutory or equitable tolling is warranted sufficient to make the claims timely or that his claims relate back to claims raised in the initial application.

With respect to tolling, petitioner filed an application for a writ of error coram nobis on March 8, 2001, which was denied by the Appellate Division on July 9, 2001.

He filed a motion to vacate judgment on May 1, 2001, which was denied by the trial court on July 9, 2001. Leave to appeal the denial of the motion to vacate judgment was denied by the Appellate Division on January 4, 2002. Tolling the entire 302–day period during which these proceedings were pending, petitioner's new claims in his amended habeas application are out of time by 430 days. Petitioner has made no argument in support of equitable tolling of the statute.

Prisoners cannot circumvent the strict AEDPA limitations period by invoking the "relation back" doctrine by arguing that a new petition should be treated as having been filed on the same day as a first petition. As the Court of Appeals for the Second Circuit has explained,

> If [the limitations period] were interpreted as Petitioner argues, the result would be impractical. A habeas petitioner could file a non-exhausted application in federal court within the limitations period and suffer a dismissal without prejudice. He could then wait decades to exhaust his state court remedies and could also wait decades after exhausting his state remedies before returning to federal court to "continue" his federal remedy, without running afoul of the statute of limitations.

*Warren v. Garvin*, 219 F.3d 111, 114 (2d Cir.2000) (quoting *Graham v. Johnson*, 168 F.3d 762, 780 (5th Cir.1999)).

■ The ineffective assistance of counsel claim relating to counsel's failure to seek to reopen a *Wade* hearing does sufficiently relate back to one of the claims filed in the initial habeas application, making consideration of that claim proper. The remaining claims are untimely and do not relate back to any claims in the initial petition.

Petitioner was not prevented from filing his claims by any State action in violation of the Constitution, he asserts no constitu-tional right newly recognized by the Supreme Court, and none of his claims rely on facts that could not have been discovered in a timely manner through the exercise of due diligence. *See* 28 U.S.C. § 2254(d)(1)(B)-(D).

Petitioner does not make a colorable claim that he is actually innocent of the crime and that the time bar should therefore be waived.

**B. Analysis of Timely Claims**

**1. Improper Cross–Examination**

Petitioner first claims that he was deprived of due process because the trial court allowed cross-examination of petitioner on an unrelated misdemeanor arrest. This claim was rejected by the Appellate Division as "either unpreserved for appellate review or without merit." *People v. Kendrick*, 256 A.D.2d 420, 682 N.Y.S.2d 234 (2d Dep't 1998). Because the issue was hotly contested at trial and defense counsel made clear his objection to the court's amended *Sandoval* ruling, it can only be assumed that the Appellate Division rejected the claim on the merits and that review should proceed under the deferential standards of AEDPA. Because the claim is meritless under any standard, however, review will proceed *de novo*.

■ Because petitioner testified at trial, this claim is cognizable on habeas review. *See Luce v. United States*, 469 U.S. 38, 43, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984) ("to raise and preserve for review the claim of improper impeachment with a prior conviction, a defendant must testify"); *cf. Grace v. Artuz*, 258 F.Supp.2d 162, 171 (E.D.N.Y. 2003) ("petitioner's claim as to the impropriety of the *Sandoval* ruling does not raise a constitutional issue cognizable on habeas review"). For a habeas petitioner to prevail on a claim that an evidentiary

error amounted to a deprivation of due process, he must show that the error was so pervasive as to have denied him a fundamentally fair trial. *United States v. Agurs,* 427 U.S. 97, 108, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). The standard is "whether the erroneously admitted evidence, viewed objectively in light of the entire record before the jury, was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it. In short it must have been 'crucial, critical, highly significant.'" *Collins v. Scully,* 755 F.2d 16, 19 (2d Cir.1985) (quoting *Nettles v. Wainwright,* 677 F.2d 410, 414–15 (5th Cir.1982)). This test applies post-AEDPA. *See Wade v. Mantello,* 333 F.3d 51, 58–59 (2d Cir.2003).

As noted in the factual description, *supra* Part I, the trial court initially ruled that petitioner could not be impeached with evidence that at the time of trial an outstanding misdemeanor charge was pending against him. The trial court, in response to a prosecution motion, amended the ruling after petitioner opened the door to cross examination by testifying on direct, *inter alia,* that "I have never been locked up before. I never did no time. I said I'm a law abiding citizen."

In *People v. Betts,* the New York Court of Appeals acknowledged that the "policy of protecting the defendant's opportunity to testify, while allowing the prosecution a balanced evidentiary response, is well served by the rule that the defendant's choice to testify in the case on trial does not, by itself, effect a waiver of the privilege against self-incrimination as to pending unrelated charges." 70 N.Y.2d 289, 520 N.Y.S.2d 370, 514 N.E.2d 865, 868 (1987). The Court went on to note, however, that "[t]his rule will not … preclude prosecutors from inquiry into pending criminal charges if a defendant, in taking the stand, makes assertions that open the

door and render those charges relevant for contradiction and response." *Id.*

■ The trial court's conclusion that petitioner opened the door with his emphatic denials that he had never been locked up before and that he was a law-abiding citizen was arguably reasonable, even though somewhat harsh. Its decision to allow petitioner's impeachment is arguably a justifiable evidentiary ruling that petitioner would rather have avoided but that did not deny him a fair trial. Habeas corpus relief on this claim is not warranted.

2. Suggestive Lineup

Petitioner next complains about the allegedly suggestive lineup. Facts related to this issue are detailed extensively in Part I, *supra.* The Appellate Division rejected the claim on both procedural grounds and on the merits:

> Preliminarily, it is noted that the defendant relies on portions of the trial record in support of his contention that a lineup was unduly suggestive. An appellate court is "precluded from reviewing trial testimony in determining whether the hearing court acted properly." The propriety of the hearing court's ruling must be determined only in light of the evidence that was before that court Since the defendant did not seek to reopen the hearing based on the trial testimony or move for a mistrial, the instant issue is not properly before this Court. In any event, the claim is without merit.

*Kendrick,* 682 N.Y.S.2d at 235 (citations omitted).

■ It is doubtful that defense counsel's inclusion of trial testimony in his argument in support of a suggestive-identification claim could, standing alone, provide an adequate state procedural ground for a

default that would preclude federal review of the claim. Resolution of that question is unnecessary, however, because the Appellate Division's alternative merits holding is neither contrary to nor an unreasonable application of clearly established federal law as determined by the Supreme Court.

In *Wade*, the Supreme Court recognized that there is a "grave potential for prejudice, intentional or not, in the pretrial lineup, which may not be capable of reconstruction at trial," 388 U.S. at 236, 87 S.Ct. 1926, and that to protect defendant's Sixth Amendment rights the trial court must ascertain prior to trial whether a witness's identification testimony is tainted by an improperly made identification. The Court has set forth a two-step inquiry for evaluating the constitutional permissibility of in-court identification testimony based on out-of-court identification procedures, "requiring a determination of whether the identification process was impermissibly suggestive and, if so, whether it was so suggestive as to raise 'a very substantial likelihood of irreparable misidentification.'" *Jackson v. Fogg*, 589 F.2d 108, 111 (2d Cir.1978) (quoting *Neil v. Biggers*, 409 U.S. 188, 198, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) (citing *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968))). "If pretrial procedures have been unduly suggestive, a court may nonetheless admit in-court identification testimony if the court determines it to be independently reliable." *United States v. Wong*, 40 F.3d 1347, 1359 (2d Cir.1994) (citing *Manson*, 432 U.S. at 114, 97 S.Ct. 2243); *Jarrett v. Headley*, 802 F.2d 34, 42 (2d Cir.1986).

In *Manson*, the Court stated that "reliability is the linchpin in determining the admissibility of identification testimony," and that the factors to be considered in determining reliability include "[1] the opportunity of the witness to view the criminal at the time of the crime, [2] the wit-

ness' degree of attention, [3] the accuracy of his prior description of the criminal, [4] the level of certainty demonstrated at the confrontation, and [5] the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself." 432 U.S. at 114, 97 S.Ct. 2243.

In the instant case, the circumstances surrounding the conduct of the lineup are troubling. Cast in the best possible light, the young eyewitness to the crime, Brandon Rogers, recognized petitioner as the assailant but was led astray by the similarity of the sneakers worn by one of the fillers to those worn by the assailant. Rectifying his mistake unprompted just minutes after the lineup was completed, his identification of petitioner was reliable and not the product of undue suggestion.

From a more critical perspective, the identification was fraught with problems. Rogers was informed that the killer would be in the lineup. He identified the wrong man as the assailant and chose petitioner only after being informed of his mistake. Having now identified petitioner as the killer, any subsequent in-court identification of petitioner by Rogers was almost assured.

A reasonable trial judge could have suppressed evidence of Rogers' pretrial identification of petitioner and could have refused to allow an in-court identification of petitioner. That, however, is not the standard of review petitioner must overcome in order to merit granting of the writ. The trial court's conclusion that the lineup was not suggestive is reasonable both as a matter of law and as a finding of fact.

Moreover, defense counsel argued at length during the trial that Rogers' identification was untrustworthy because of the suggestive nature of the identification procedure, thus allowing the jury to determine for itself whether to credit the boy's

identifications. This observation is not, however, relied on by this court in its determination that habeas corpus relief is unwarranted on *Wade* or *Manson* grounds. *See Wray v. Johnson,* 202 F.3d 515, 524 (2d Cir.2000) (remanding with directions to grant the writ, tacitly concluding that the district court improperly found a suggestive identification procedure to be harmless in light of defense counsel's demonstration to the jury of the weakness of an out-of-court identification).

The Appellate Division's conclusion that the lineup was not suggestive and that Rogers' identifications of petitioner were reliable is reasonable. Habeas corpus relief on this claim is not warranted.

### 3. Ineffective Assistance of Trial Counsel (*Wade* Issues)

Petitioner claims that he received ineffective assistance of counsel because trial counsel failed to request a mistrial or seek reopening of a *Wade* hearing after witness testimony at trial supported the possibility of tainted identification procedures. This claim was rejected on procedural grounds by the trial court when raised in a motion to vacate judgment. It was also denied on the merits. It is unnecessary to determine whether the procedural bar was adequate. Review proceeds under the deferential standards of AEDPA.

■■■ The Appellate Division rejected petitioner's claim that the pretrial lineup was unduly suggestive on the ground that the issue was not properly before it because defense counsel failed to seek to reopen the *Wade* hearing. As the trial court noted in its denial of petitioner's motion to vacate judgment, however, the Appellate Division went on to reject petitioner's suggestive identification claim as meritless. Under these circumstances, petitioner cannot show that he was prejudiced by defense counsel's performance, since the defaulted claim would have been

rejected by the Appellate Division even if properly preserved. More particularly, the testimony of Rogers at trial was consistent with his testimony at the pretrial hearing; there is no likelihood that a motion to reopen the *Wade* hearing would have been successful. Habeas corpus relief on this claim is not warranted.

### C. Untimely Claims

Petitioner's untimely claims may not be reviewed by this court. Nonetheless, they are meritless for the reasons discussed below. Unless otherwise noted below, all claims are reviewed under a *de novo* standard.

### 1. Ineffective Assistance of Trial Counsel (Opening Argument)

■■■ Petitioner claims that he received ineffective assistance of counsel due to counsel's failure to make an opening statement. The decision whether or not to give an opening statement is strategic in nature. Particularly given defense counsel's active interaction with prospective jurors during the *voir dire,* it was arguably a justifiable strategy to opt to waive the opening. Habeas corpus relief on this ground is not warranted.

### 2. Ineffective Assistance of Trial Counsel (911 Tapes)

Petitioner claims that he received ineffective assistance of trial counsel because counsel failed to request 911 tapes. As best this court can determine, petitioner has nowhere—in either papers filed in this proceeding or in briefs in the state courts—explained why 911 tapes might have been exculpatory or otherwise useful to the defense. Petitioner has thus failed to demonstrate that he was prejudiced by counsel's failure to request the tapes. Habeas corpus relief on this claim is not warranted.

### 3. Ineffective Assistance of Trial Counsel (Bolstering)

Petitioner claims he received ineffective assistance of trial counsel because counsel failed to object to the bolstering of police officers. Petitioner's has not elaborated on this claim either in the state courts or before this court. Review of the transcript reveals no bolstering of any significance. Trial counsel was not ineffective in this regard.

Habeas corpus relief on this claim is not warranted. In addition, neither singly nor cumulatively were any deficiencies in trial counsel's performance sufficient to merit granting of the writ.

### 4. *Rosario* and *Brady* Violations

Petitioner also claims *Rosario* and *Brady* violations created by the failure of the prosecution to disclose results of forensic fingerprint reports and analysis, and a *Brady* violation created by the prosecution's failure to release DD5 reports to petitioner which revealed that another man had been arrested for the same crime one day after petitioner was selected from a lineup.

▇▇ Federal habeas corpus relief does not lie for mere errors of state law. *Estelle v. McGuire*, 502 U.S. 62, 68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). Because a *Rosario* claim is purely a state right, embodying " 'policy considerations grounded in state common law, not constitutional principles,' " the prosecutorial failure to turn over *Rosario* material is not subject to habeas review by a federal court. *Whittman v. Sabourin*, 2001 WL 687369, at *3 (S.D.N.Y. June 12, 2001) (quoting *Southerland v. Walker*, 1999 U.S. Dist. LEXIS 19327, at *9 (S.D.N.Y. Dec. 10, 1999)).

▇▇ The prosecution in a criminal matter has a constitutional obligation to disclose exculpatory evidence to the defendant. *See Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). "A finding of materiality of the evidence is required under *Brady*." *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Exculpatory evidence is considered material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler v. Greene*, 527 U.S. 263, 280, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) (quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). Nondisclosure merits relief only if the prosecution's failure " 'undermines confidence in the outcome of the trial.' " *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (quoting *Bagley*, 473 U.S. at 678, 105 S.Ct. 3375). The Supreme Court has rejected any distinction between impeachment evidence and exculpatory evidence. *See Bagley*, 473 U.S. at 676, 105 S.Ct. 3375. Impeachment evidence "is 'evidence favorable to an accused,' *Brady*, 373 U.S. at 87, 83 S.Ct. 1194, so that, if disclosed and used effectively, it may make the difference between conviction and acquittal." *Id.* The "individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police." *Kyles*, 514 U.S. at 437, 115 S.Ct. 1555; *see also Pennsylvania v. Ritchie*, 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987) (assuming that state child protective agency files could be *Brady* material).

▇▇ In support of his *Brady* claim, petitioner complains that the prosecution failed to turn over forensic fingerprint reports and analysis, as well as DD5 reports showing that another man, fitting the description of the assailant, had been arrested for the same crime one day after peti-

tioner was identified by Rogers in the lineup. The trial court, in rejecting petitioner's *Brady* claims, noted that petitioner's factual assertions "are either contradicted by court records and transcripts or are made solely by the [petitioner] and unsupported by any other affidavits or evidence." July 9, 2001 Decision at 4. That factual determination appears defensible. Transcripts of the pretrial hearings and a letter and attachment from the prosecution to defense counsel reveal that the defense was provided with fingerprint analysis and reports that petitioner claims was withheld from him.

Respondent states that the police reports detailing the arrest of another suspect were turned over to the defense on September 13, 1995, prior to trial. There is nothing in the record to contradict that assertion aside from petitioner's unsupported claim. Habeas corpus relief on *Brady* or *Rosario* grounds is not warranted.

### 5. Ineffective Assistance of Appellate Counsel

Petitioner contends that appellate counsel was ineffective for failing to raise claims of ineffective assistance of trial counsel and for inappropriately relying on trial transcripts instead of hearing transcripts when raising the suggestive identification claim on direct appeal. Because these underlying claims are without merit, appellate counsel's failure to raise them did not prejudice petitioner. Habeas corpus relief is not warranted.

### IX. Conclusion

The petition for a writ of habeas corpus is denied.

A certificate of appealability is granted with respect to petitioner's claims (1) that a suggestive pretrial lineup was unduly suggestive and resulted in tainted pretrial and in-court identifications that violated his Sixth Amendment rights; and (2) that the trial court's revised *Sandoval* ruling in the midst of trial denied petitioner a fair trial.

No certificate of appealability is granted with respect to any of petitioner's remaining claims, petitioner having made no substantial showing of the denial of a constitutional right. Petitioner may seek a further certificate of appealability from the Court of Appeals for the Second Circuit.

SO ORDERED.